Randall J. SOILEAU, Plaintiff,
Appellant,

v.

GUILFORD OF MAINE, INC.,
Defendant, Appellee.

No. 96–1796.

United States Court of Appeals,
First Circuit.

Argued Dec. 5, 1996.

Decided Jan. 23, 1997.

Martha S. Temple, Bangor, ME, with whom Foote & Temple was on brief, for plaintiff–appellant.

Richard G. Moon, Portland, ME, with whom James P. Bailinson and Moon, Moss, McGill & Bachelder, P.A. were on brief, for defendant–appellee.

Before CYR and LYNCH, Circuit Judges, and McAULIFFE, District Judge.*

LYNCH, Circuit Judge.

Randall Soileau, terminated from his employment as an industrial process engineer at Guilford of Maine, Inc., seeks redress under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Maine Human Rights Act, Me.Rev.Stat. Ann. tit. 5, § 4551 *et seq.* He first claims that Guilford discriminated against him because of his disability. He is disabled, he asserts, because his diagnosed depressive disorder interferes with his ability to interact with others. That ability, he says, is a "major life activit[y]" which has been "substantially limit[ed]" within the meaning of the ADA. 42 U.S.C. § 12102(2). Secondly, he says, the termination of his employment was in retaliation for his requesting a reasonable accommodation. His claims were rejected on summary judgment by the trial court in a carefully reasoned opinion, *Soileau v. Guilford of Maine, Inc.*, 928 F.Supp. 37 (D.Me.1996). We affirm.

---

*Of the District of New Hampshire, sitting by

I

Only those facts necessary to resolve the legal issues are outlined. The facts are described in the light most favorable to Soileau, the party against whom summary judgment was entered. *Hoeppner v. Crotched Mountain Rehabilitation Ctr., Inc.*, 31 F.3d 9, 14 (1st Cir.1994).

Soileau worked in various capacities for Guilford from 1979 until April 22, 1994. In 1986, he began working in the industrial engineering department as a time study analyst, which involved timing various aspects of production at Guilford. A subset of his duties involved facilitating Process Activity Analysis ("PAA") meetings, at which ways of improving department efficiency were discussed. In 1992, Soileau began working for a new supervisor, Matt Earnest, who found areas of Soileau's performance not to his liking. Around this time, Soileau requested a pay raise which was not granted; after this, Earnest perceived a marked deterioration in Soileau's attitude. The relationship between Soileau and Earnest quickly soured, with Soileau feeling that Earnest was harassing him. While rating Soileau's work performance as average to above average, Earnest consistently cautioned that Soileau needed to gain credibility and the respect of his coworkers.

On May 10, 1993, Earnest gave Soileau a verbal warning about his negative attitude at work. Earnest requested that Soileau elicit his co-workers' views on his performance, which Soileau did. When Earnest asked Soileau to come up with a plan to address the weaknesses identified in this survey, Soileau refused, because he felt the survey did not show any problem areas. On March 22, 1994, Earnest instructed Soileau to train a co-worker to perform some of Soileau's duties in preparation for expanding the PAA program to other departments. When Soileau did not do so (because he felt the request was not authorized by the pertinent plant committees), a dispute arose between the two men.

After consulting with the company's human resources manager, Earnest issued Soi-

designation.

leau a "Final Written Warning/Suspension" on March 23, 1994. This warning listed four performance deficiencies, ordered a two day suspension, and required Soileau to evaluate his own performance and come back with an improvement plan. The warning said there would be a four week period during which Soileau's performance would be monitored. Failure to improve would lead to other consequences, which could include job termination. Earnest explained all of this to Soileau that day.

The final warning proved, understandably, to be very stressful for Soileau. On March 28, Soileau told Earnest that he had been suicidal several years earlier and that he feared he was becoming ill again. Earnest had been unaware of Soileau's condition; all he had known was that in 1990 Soileau had taken a disability leave for stress.

On April 6, Soileau went to see a psychologist, Dr. Dannel Starbird, whom he had seen four years earlier during a depressive episode which had been precipitated in part by his deteriorating relationship with his girlfriend. In 1990, Dr. Starbird had diagnosed Soileau with dysthymia, a chronic depressive disorder characterized by intermittent bouts of depression. On Dr. Starbird's advice, Soileau had sought and received a five week disability leave from work. He had returned to work without restriction and had no further psychological counselling until just after he received the final warning in March 1994.

Soileau told Dr. Starbird that his job was in jeopardy. Dr. Starbird diagnosed Soileau as suffering from a bout of depression, a condition that was probably caused by receiving the warning. On April 7, Soileau told Earnest that he was having a difficult time interacting with other people and having a particularly hard time facilitating the PAA meetings. Earnest agreed that, for the time being, Soileau would be relieved of his responsibilities for facilitating meetings and would mainly do clerical work. That was done.

On April 12, Dr. Starbird wrote to Guilford. The letter asked that Soileau's work duties be "restricted so as to avoid responsibilities which require significant interaction with other employees," and advised that Soileau "should not be ridiculed, provoked or startled by or in front of supervisors or other employees."

Earnest and Soileau met on April 21; Earnest said he felt the accommodations already made met the requests in the doctor's letter. At no time during that meeting or the four week trial period did Soileau present an improvement plan to address the four points raised in the written warning.

On April 22, Soileau's employment was terminated. Earnest told Soileau it was because there had been no improvement in the four problem areas and because Soileau had not submitted an improvement plan. In May, Soileau began looking for another job. He looked for full-time employment and placed no restrictions on the type of work sought.

## II

Review of entry of summary judgment is de novo. *Wood v. Clemons*, 89 F.3d 922, 927 (1st Cir.1996).

As the district court noted, interpretation of the ADA and of the Maine Human Rights Act have proceeded hand in hand, and so we discuss the ADA, which has provided guidance to Maine courts in interpreting the state statute. *Winston v. Maine Technical College Sys.*, 631 A.2d 70, 74 (Me.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1643, 128 L.Ed.2d 364 (1994).

Soileau's initial claim under the ADA depends on his establishing that he suffers from a "disability" within the meaning of the statute. *Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 511 (1st Cir.1996); *see also* 42 U.S.C. § 12112(a). The definition of disability must be understood in light of congressional objectives in enacting the ADA. In an effort to eliminate discrimination against individuals with disabilities, the statute prohibits employers from discriminating against "a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). The antidiscrimination obligation is unusual in the context of federal civil rights statutes. It imposes not only a prohibition against discrimination, but also,

in appropriate circumstances, a positive obligation to make reasonable accommodations. Absent a disability, however, no obligations are triggered for the employer.

■ Only one of the ADA's three definitions of "disability" is pertinent here: Soileau claims that he suffered from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Id.* § 12102(2)(A); *see Katz v. City Metal Co.,* 87 F.3d 26, 30–31 (1st Cir.1996).

To make out a prima facie case of discrimination based on this definition of disability, Soileau must establish three elements: (1) that he had a "physical or mental impairment" that (2) "substantially limits" (3) "a major life activity." 42 U.S.C. § 12102(2)(A). Soileau has successfully shown that he met the first element; his diagnosed dysthymia is a mental impairment within the meaning of the statute. *See* 29 C.F.R. § 1630.2(h)(2). However, the evidence Soileau produced does not suffice, as a matter of law, for a reasonable jury to conclude that he was substantially impaired in a major life activity. Soileau constructs his argument by saying that the ability to get along with others is the major life activity [1] in which he is substantially impaired. The regulations promulgated by the Equal Employment Opportunity Commission under the ADA do not list such an ability among the exemplars of major life activities.[2] *Id.* § 1630.2(i).

The concept of "ability to get along with others" is remarkably elastic, perhaps so much so as to make it unworkable as a definition. While such an ability is a skill to be prized, it is different in kind from breathing or walking, two exemplars which are used in the regulations. Further, whether a person has such an ability may be a matter of subjective judgment; and the ability may or may not exist depending on context.

Here, Soileau's alleged inability to interact with others came and went and was triggered by vicissitudes of life which are normally stressful for ordinary people—losing a girlfriend or being criticized by a supervisor. Soileau's last depressive episode was four years earlier, and he had no apparent difficulties in the interim. To impose legally enforceable duties on an employer based on such an amorphous concept would be problematic. It may be that a more narrowly defined concept going to essential attributes of human communication could, in a particular setting, be understood to be a major life activity, but we need not address that question here.

■ But even assuming, *dubitante,* that a colorable claim may be made that "ability to get along with others" is or may be (on specific facts) a major life activity under the ADA, the evidence here does not show any substantial limitation. Under the relevant ADA regulation an individual faces a "substantial limitation" when he is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id.* § 1630.2(j)(1). One factor to be considered in determining whether an individual is substantially limited in a major life activity is "the nature and severity" of the impairment. *Id.* § 1630.2(j)(2)(i). The evidence does not establish that Soileau had particular difficulty in interacting with others, except for his supervisor. Impairment is to be measured in relation to normalcy, or, in any event, to

---

1. Although Soileau also argued to the district court that his ability to work was the major life activity that had been impaired, he has not pursued this claim on appeal. In any event, this claim would fail because he has not shown he is unable to work. *See* 29 C.F.R. § 1630.2(j)(3).

2. The EEOC Compliance Manual does list interacting with others as a major life activity. EEOC Compliance Manual (CCH) § 902.3, ¶ 6883, at

5311 (1995). While this court has found reference to the EEOC Compliance Manual to be helpful on occasion, *see, e.g., Katz,* 87 F.3d at 31, the manual is hardly binding. *Cf. Schmidt v. Safeway Inc.,* 864 F.Supp. 991, 1001 (D.Or.1994) (noting that the EEOC Technical Assistance Manual "is not law" and "does [not] have the force of law").

what the average person does. Soileau claims he had to leave pubs and stores when they became crowded. But there is nothing extraordinary about preferring uncrowded places. Soileau performed his normal daily chores, went grocery shopping, and visited pubs. That he left pubs and stores when he felt there were too many people does not establish that the nature and severity of his impairment were substantial.

◼ Another factor to be considered is the expected duration of the impairment. *Id.* § 1630.2(j)(2)(ii). While Dr. Starbird believes that Soileau's underlying disorder (dysthymia) will be a life-long condition, Soileau has failed to adduce any evidence that his impairment—the acute, episodic depression—will be long-term. His last depressive episode, in 1990, required only a five week work absence before he was able to return to his duties without restriction. During the 1994 episode, Dr. Starbird suggested, at most, that Soileau not have to run meetings for a four month period. Considering these factors both separately and together, Soileau has not met his burden. The impairment must be a significant one to trigger the Act's obligation.

## III

◼ Soileau asserts an independent claim that his employment was terminated in retaliation for his requesting an accommodation. He may assert such a claim even if the underlying claim of disability fails. *Mesnick v. General Elec., Co.,* 950 F.2d 816, 827 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

The ADA prohibits discrimination against an individual "because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

It is questionable whether Soileau fits within the literal language of the statute: he filed no charge, nor participated in any investigation. Moreover, he did not literally oppose any act or practice, but simply requested an accommodation, which was given. It would seem anomalous, however, to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge. This would leave employees unprotected if an employer granted the accommodation and shortly thereafter terminated the employee in retaliation. And so, without addressing the issue any further, we will assume *arguendo* that Soileau's request brings him within the coverage of 42 U.S.C. § 12203(a).

The ADA incorporates the procedures and enforcement mechanisms of Title VII, the basic statute prohibiting discrimination in employment. *See id.* § 12117(a). Accordingly, guidance on the proper analysis of Soileau's ADA retaliation claim is found in Title VII cases. *Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Assoc. of New England, Inc.,* 37 F.3d 12, 16 (1st Cir.1994).

◼ By analogy to Title VII, to establish a claim of retaliation Soileau must show that he was engaged in protected conduct, that he was discharged, and that there was a causal connection between the discharge and the conduct. *Wyatt v. City of Boston,* 35 F.3d 13, 15 (1st Cir.1994) (per curiam); *Hoeppner,* 31 F.3d at 14.

Soileau relies primarily on the timing of events, saying he was discharged right after he asked for an accommodation. True enough. But that narrow focus ignores the larger sequence of events and also the larger truth. The larger picture undercuts any claim of causation.

Soileau was disciplined and warned of discharge if his performance did not improve and if he did not submit a performance plan. The discipline and warning happened before Guilford ever knew that Soileau was asserting he was presently disabled and before Soileau asked for the accommodation of not running meetings.[3] Accordingly, that disci-

---

**3.** Soileau had not claimed earlier that he was disabled and the employer is not put on notice of a present disability merely because an employee some years in the past has taken medical leave or has sought psychological counselling.

pline and explicit warning could not have been motivated, even in part, by a request for an accommodation.[4]

There is no other evidence tending to support the retaliation claim. Soileau admitted at his deposition that he never formulated any improvement plan for Earnest. He had been told that termination was a possible outcome if he did not submit a plan. On appeal, Soileau argues that his seeking psychological counselling was, in essence, an improvement plan. If so, he never said that to his employer, who knew only that no plan had been provided. Further, it is undisputed that in the interim Guilford did provide the accommodation which Soileau and his psychologist requested. Soileau no longer had to run meetings. Evidence that an employer willingly granted an employee's request for an accommodation, though by no means dispositive of the matter, tends to militate against making an inference of retaliation in a case like this one.

In short, the timing dictates against concluding that the request for accommodation caused the termination, and nothing else provides evidence from which such an inference may be drawn. While the discipline of termination was swift, and even harsh, the evidence does not support a retaliation claim.

The entry of summary judgment for the defendant is *affirmed.*

---

**4.** A danger of the line of argument presented by Soileau is that it would permit an employee already on notice of performance problems to seek shelter in a belated claim of disability. The ADA was not meant to prevent employers from taking steps to address poor performance by non-disabled employees. As Judge Sporkin has said in rejecting an ADA retaliation claim, "To allow the antidiscrimination laws to be used by poorly performing employees will eventually work to the detriment of those who have a legitimate need for the protection of the laws." *Henry v. Guest Servs., Inc.,* 902 F.Supp. 245, 254 (D.D.C.1995), *aff'd,* 98 F.3d 646 (D.C.Cir.1996).