USCA1 Opinion

 

 
 United States Court of Appeals
 For the First Circuit
 ____________________
 
 No. 97-1947
 
 PHILLIP D. CHAMPAGNE,
 
 Plaintiff, Appellant,
 
 v.
 
 SERVISTAR CORPORATION,
 
 Defendant, Appellee.
 
 ____________________
 
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Frank H. Freedman, Senior U.S. District Judge]
 
 ____________________
 
 Before
 
 Torruella, Chief Judge ,
 Boudin and Lynch, Circuit Judges.
 
 ____________________
 
 
 Edward M. Pikula for appellant.
 
 Charles P. Roberts, III, with whom Haynsworth, Baldwin,
 Johnson and Greaves, Daniel Finnegan, and Bulkley, Richardson
 and Gelinas were on brief, for appellee.
 
 ____________________
 
 March 12, 1998
 ____________________ LYNCH, Circuit Judge. Phillip D. Champagne sued his
 former employer Servistar Corporation under the Americans with
 Disabilities Act of 1990, 42 U.S.C. 12101-12213. Champagne,
 a truck driver, alleged that Servistar unlawfully terminated
 his employment because he was disabled. His disability, he
 said, was that he suffered from emotional disorders which
 required him to drive only familiar routes, avoid high bridges,
 and not rotate truck routes as did other Servistar drivers. 
 Champagne also alleged that his termination was in retaliation
 for his filing disability discrimination charges and that
 Servistar threatened to withdraw the workplace accommodation it
 had earlier given him. The district court rejected these
 claims in a carefully reasoned opinion granting summary
 judgment. We affirm.
 I As summary judgment has been granted, we review the
 facts in the light most favorable to Champagne and will draw
 all reasonable inferences in his favor. See Soileau v.
 Guilford of Maine, 105 F.3d 12, 13 (1st Cir. 1997). Because
 the issue of causation as to the termination of Champagne's
 employment is largely dispositive of the case, we focus
 particularly on those facts.
 Servistar is a cooperative engaged in the
 distribution of hardware, lumber, and building materials to
 approximately 3,700 owner-member stores nationwide. In June
 1974, Servistar hired Champagne as a truck driver at its
 Westfield, Massachusetts distribution center ("Westfield
 terminal"). Champagne, one of approximately twenty regular
 truck drivers at the Westfield terminal, operated a tractor-
 trailer and delivered merchandise to stores throughout New
 England and eastern New York.
 At the time of Champagne's hiring, Servistar had a
 long-standing policy of requiring drivers to rotate their
 routes on a periodic basis. The object of this policy was to
 better monitor driver productivity by comparing different
 drivers on the same route, obtain better feedback on customers'
 needs by gaining the perspective of numerous drivers, and
 equalize pay, work load, and overall driver responsibilities. 
 Champagne, like all Servistar drivers, was subject to this
 policy. 
 In the mid-1980's, Champagne began to develop
 emotional problems which increasingly interfered with his
 ability to rotate routes. These problems included general
 anxiety, feelings of despair, suicidal tendencies, and a
 specific phobia of crossing bridges. Champagne told his
 psychiatrist, Dr. Carl Saviano, that he sought to avoid bridges
 with which he was unfamiliar or thought unsafe (Champagne
 especially feared high bridges with low railings) for fear that
 he would commit suicide by driving off the bridge. Champagne
 did not inform Servistar of his condition. In 1988, Champagne
 asked his supervisor at the Westfield terminal to exempt him
 from route-rotation and to allow him to drive a set route. 
 Champagne's supervisor granted this request. In 1990,
 Champagne fell into a major depression and was hospitalized for
 two weeks in the psychiatric unit at the Cooley-Dickinson
 Hospital in Northampton, Massachusetts.
 When other drivers at the Westfield terminal began to
 complain about Champagne's exemption from the route rotation
 system, Servistar's Vice President of Human Resources, Russell
 Thomas, asked Champagne to supply a medical reason for driving
 a set route. In November 1990, Champagne produced a note from
 Dr. Saviano stating: "It is most important for Mr. Champagne's
 health that he have very regular work hours and a very regular,
 predictable schedule." Because the note did not explain the
 nature of Champagne's problems, Thomas called Dr. Saviano for
 further explanation. Dr. Saviano did not reveal Champagne's
 condition, but simply repeated that it would be in Champagne's
 best interest for him to continue driving the set route. On
 this advice, Thomas asked Champagne's supervisor to leave
 Champagne on the set route, and the supervisor agreed. 
 Champagne continued to work without incident. Indeed,
 Champagne's evaluations for 1991 through 1993 show that his
 performance was exemplary.
 In mid-1992, Servistar made managerial changes
 affecting the Westfield terminal. Phil Hammonds became the new
 warehouse manager at the Westfield terminal, thus becoming
 Champagne's new supervisor, and Tom Brennan became Servistar's
 new Vice President of Operations. Hammonds discovered that
 drivers at the Westfield terminal were switching routes on
 their own initiative and that three drivers, including
 Champagne, were driving set routes. Hammonds, based on the
 medical information before him, did not believe that Champagne
 and the other individuals driving set routes suffered from
 medical disabilities preventing them from complying with the
 route-rotation requirement. 
 In early 1993, Brennan and Hammonds reinstated strict
 route rotation across the board at the Westfield terminal. 
 Routes were organized into groups of four or five routes and
 drivers were required to rotate within these groups. On June
 14, 1993, Champagne produced another short note from Dr.
 Saviano recommending that Champagne continue to drive a set
 route. No explanation was given nor was a claim made that
 Champagne was disabled: "Mr. Champagne requires regular
 psychotherapy sessions. It is essential that Mr. Champagne's
 treatment be augmented and supported by a very regular work
 schedule." On June 17, 1993, Hammonds told Champagne by phone
 that Champagne would have to meet normal route-rotation
 requirements or go to work in the warehouse until he was able
 to do so. On June 21, 1993, Hammonds sent written notice to
 all drivers on set routes, including Champagne, that Servistar
 expected them to drive according to rotating schedules and
 that, if they were unable to rotate routes within 30 days for
 medical reasons, they would, as an accommodation, be placed on
 light duty status and transferred to the warehouse. Transfer
 to the warehouse would have entailed a loss of pay for
 Champagne.
 Champagne regarded his regular route as an
 accommodation to his mental condition, and he believed that the
 notice from Servistar constituted a threatened withdrawal of
 reasonable accommodation in violation of the ADA. On July 15,
 1993, Champagne filed a disability discrimination complaint
 with the Massachusetts Commission Against Discrimination and
 the Equal Employment Opportunity Commission. He filed a civil
 action in Massachusetts state court seeking to enjoin Servistar
 from removing him from his regular route. The state court
 granted a temporary restraining order against Servistar. 
 Servistar complied with the TRO and, before the hearing on a
 preliminary injunction, voluntarily agreed to leave Champagne
 on the set route pending receipt of more specific information
 on Champagne's condition. 
 Champagne did not release his medical records to
 Servistar, apparently on the advice of his attorney. Dr.
 Saviano, however, responded to Servistar's inquiries about
 Champagne's condition in a letter dated October 20, 1993. Dr.
 Saviano informed Servistar that Champagne suffered from anxiety
 disorders caused by previous emotional injuries, and he
 reiterated his view that Champagne needed "a fixed regular
 schedule in which he travels the same route, sees the same
 people and performs the same activities routinely." Dr.
 Saviano said that such a schedule would permit Champagne to
 control his anxieties. "Even changes known well in advance
 could be very hurtful to his therapy and his well being."
 II In the meantime, other events were unfolding. In the
 fall of 1993, two items of information came to Hammonds'
 attention suggesting that at least some Servistar drivers were
 falsifying travel logs they are required to keep by the federal
 Department of Transportation ("DOT"). DOT regulations require
 interstate truckers to record their driving time, non-driving
 but on-duty time, and off-duty time.
 The first item of information was that a Servistar
 truck had been observed parked on a residential street for a
 period of time. Hammonds checked the logs, which indicated the
 driver had been on duty at the time the truck was parked on the
 street. Hammonds prepared a recommendation to fire the driver,
 believing the facts indicated that the driver was basically
 "stealing" time, and therefore pay. When Hammonds met with
 the driver, the driver indicated he had "carried over" time
 from the prior day in order to comply with DOT regulations, but
 that he put the time in. Hammonds decided not to fire the
 driver, but still gave the driver a written reprimand for
 falsifying the logs.
 The second item of information was the discovery that
 Champagne was making excessive use of the company telephone
 credit card that had been issued to him. Servistar issues
 phone cards to all drivers and drivers are allowed one fifteen
 minute call per day. Supervisor Jim Atwater noticed that
 Champagne's phone bill for September 1993 listed more than
 sixty calls, some lasting more than an hour. Atwater brought
 the phone bill to Hammonds' attention. Hammonds decided to
 take no action against Champagne on the excessive phone use. 
 Hammonds also noticed that many of the calls had been made
 during the middle of the day when Champagne would ordinarily be
 driving. Hammonds called the number from which Champagne had
 made these mid-day calls and learned that the source was a
 Holiday Inn in Ronkonkoma, New York. Hammonds cross-checked
 the phone records against Champagne's logs. He discovered that
 Champagne had recorded that he had been driving or was
 otherwise on-duty during those times when phone records showed
 he was making calls. By recording more driving time than he
 had actually performed, Champagne had been paid money he was
 not properly owed.
 Upon learning this, Servistar consulted legal counsel
 and decided to audit the logs and phone records of all
 Westfield terminal drivers when the following month's phone
 records came in, as well as to audit drivers in other locations
 randomly. Servistar realized that the phone card records gave
 it a way to test the accuracy of its drivers' logs. The all-
 driver audit was conducted the following month, in November
 1993, on the October 1993 phone bills. It revealed that four
 drivers, including Champagne, had falsified their DOT logs by
 recording they were driving at times when phone records showed
 they were making calls. Servistar did not take immediate
 action on these individuals, but decided to investigate further
 to see if a pattern existed. Servistar reaudited the four
 drivers the following month and discovered that three of the
 drivers, including Champagne, had multiple violations during
 that month as well. The fourth driver had only one violation.
 Servistar decided to terminate the employment of the
 three drivers who had multiple violations, including Champagne,
 and to give a written warning to the fourth driver. Hammonds,
 Brennan and another supervisor met individually with each of
 the three drivers who were to be fired. Each was given copies
 of records and shown the violations. Champagne did not dispute
 the evidence. In fact, Champagne said, he had been falsifying
 his DOT logs for twenty years and he did so because he did not
 want speeding violations showing in his logs. Champagne said
 this was common practice among Servistar drivers and something
 Servistar itself knew about and encouraged. On January 20,
 1994, Servistar fired Champagne and the two other drivers.
 Since these terminations, Servistar has continued to
 perform random cross-checks of drivers' logs against their
 phone bills. In late 1994, Servistar discharged another driver
 for log violations. In his twenty-five years with Servistar,
 Brennan has also terminated three other drivers for log
 violations.
 Champagne says that Servistar knew that its drivers
 routinely violated DOT log regulations, and that the use of
 such violations to terminate him masks Servistar's real
 intention to discriminate against him on account of his
 disability and retaliate for his filing a discrimination charge
 against the company. Champagne's specific evidence on this
 point is discussed below.
 III On January 27, 1995, the EEOC issued Champagne a
 "Right to Sue" letter. Champagne withdrew his state court
 action and, on February 21, 1995, filed this federal lawsuit. 
 Champagne alleged that Servistar discriminated against him
 because he was disabled in violation of 42 U.S.C. 12112(a),
 that Servistar fired him in retaliation for his filing a
 discrimination charge in violation of 42 U.S.C. 12203(a), and
 that Servistar had threatened to withdraw his workplace
 accommodation in violation of 42 U.S.C. 12203(b). Servistar
 counterclaimed for damages alleging breach of fiduciary duty,
 and fraud and deceit.
 Servistar moved for summary judgment on Champagne's
 claims and its counterclaims. The district court granted
 Servistar's motion as to Champagne's claims, holding that
 Champagne did not meet the statutory definition of disability,
 and that his evidence of retaliation or threat was insufficient
 to overcome Servistar's legitimate and nondiscriminatory
 explanation. The district court denied summary judgment as to
 Servistar's counterclaims. Champagne appeals the granting of
 summary judgment as to his three claims.
 IV The scope of our review over the district court's
 entry of summary judgment in favor of Servistar is de novo. 
 See Soileau, 105 F.3d at 14. Summary judgment is appropriate
 when the evidence shows "that there is no genuine issue as to
 any material fact and that the moving party is entitled to
 judgment as a matter of law." Fed. R. Civ. P. 56(c). 
 Champagne says he has suffered harm from two sources: 
 (1) the termination of his employment, which he says resulted
 from discrimination or retaliation or both, and (2) the
 memorandum notifying him he would have to return to rotating
 routes or work in the warehouse, which he says was a threat to
 withdraw the accommodation Servistar was obligated to grant
 him. 
 A. Termination and Retaliation
 As to the first harm, the district court carefully
 parsed Champagne's discrimination and retaliation claims, and
 concluded that Champagne did not meet the statutory definition
 of disabled and that his evidence of retaliation was
 insufficient. We take a shorter route. We have no doubt that
 Champagne suffered from a mental impairment, a first step
 toward establishing disability under the ADA. But even if
 Champagne could establish he was disabled within the meaning of
 the ADA, his case on termination fails on the issue of
 causation. Champagne has not produced evidence from which a
 finder of fact could reasonably find that Servistar "discharged
 [him] in whole or in part because of [his] disability," Equal
 Employment Opportunity Comm'n v. Amego, Inc., 110 F.3d 135, 141
 n.2 (1st Cir. 1997), or that there was a "causal connection
 between [his] discharge and the conduct" of filing an ADA
 complaint. Soileau, 105 F.3d at 16. 
 Servistar has produced considerable proof that
 Champagne was dismissed because he falsified the DOT log books
 in violation of company policy and DOT regulations, and thereby
 obtained unearned pay. This proof comes from Servistar's
 cross-referencing the phone records against DOT logs for all
 Westfield terminal drivers, not just Champagne. This audit
 proved that three drivers, including Champagne, were falsifying
 their DOT logs on a regular basis. Champagne does not
 challenge the accuracy of the telephone records demonstrating
 that Champagne was in the motel room making calls during times
 he was supposed to be driving, nor does he contest that he
 falsified his logs. Servistar terminated all three who had
 multiple violations, not just Champagne. Servistar has fired
 other drivers since that time for the same violations.
 This evidence meets Servistar's burden of
 articulating a legitimate and nondiscriminatory reason for
 terminating Champagne. Under the McDonnell Douglas framework,
 see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973),
 the burden shifts back to Champagne to show that Servistar's
 proffered reason is a pretext for discrimination based on
 disability, see Mesnick v. General Elec. Co., 950 F.2d 816,
 823-24 (1st Cir. 1991), or for retaliation, see id. at 827-28. 
 To make this showing, "[i]t is not enough for [Champagne]
 merely to impugn the veracity of [Servistar's] justification;
 he must elucidate specific facts which would enable a jury to
 find the reason given is not only a sham, but a sham intended
 to cover up the employer's real motive." Id. at 824 (internal
 quotation marks and citation omitted).
 Champagne's response is twofold. His first argument
 is that consideration of the larger context of events compels
 the conclusion that he was terminated because of discrimination
 or retaliation. His second argument is that the alleged
 misconduct for which he was fired was something which all
 Servistar drivers did, not just Champagne. As to context,
 Champagne notes that he was terminated only six months after he
 filed his discrimination complaint, despite years of good
 performance evaluations. Moreover, he says, the June 21 memo
 requiring all drivers to rotate routes, after Servistar had for
 years allowed him to drive a set route, shows discriminatory
 animus. As to his misconduct, Champagne provided an affidavit
 from a fellow driver, Jerry Gilbert, that "[t]he actions of
 Phillip Champagne of logging time which alleges drive time
 logged in longer than the time actually driven, was a common
 practice within the ranks of Servistar's truck drivers, and
 this fact was known by the supervisors of the truck drivers
 prior to Champagne's termination."
 The Gilbert affidavit is Champagne's strongest
 evidence, but it does not suffice, either alone or with the
 context evidence, to permit a reasonable inference that
 Champagne's firing was motivated by discrimination and
 retaliation. Accepting as true that historically some
 Servistar drivers falsified logs, it is undisputed that the two
 new managers of the Westfield terminal decided to do something
 about the problem when it was brought to their attention. The
 test these managers devised to determine if there had been
 falsification of records -- comparing phone records with
 driving logs -- was plainly neutral. It is undisputed that
 this test was applied equally to everyone. It is undisputed
 that the test turned up four offenders, including Champagne,
 that the employer applied the same test equally to each of
 these four for a second month to determine if there was a
 pattern, and that when the second test showed three of the four
 had repeatedly falsified their logs, including Champagne, they
 were treated equally: each had his employment terminated. And
 it is undisputed that Servistar has continued to cross-
 reference phone records against driving logs on a random basis
 and terminate those who the test shows falsified the log. No
 inference of discrimination or retaliation may reasonably be
 drawn from these facts. That others may have turned up clean
 on the test although they had falsified logs, or that others in
 the past had falsified logs but not been caught, adds nothing
 to Champagne's case. More specifically, Champagne produced no
 evidence that audits were conducted in the past or that the
 company retained drivers who were shown by an audit to have
 repeatedly falsified records.
 The contextual evidence offered to show Servistar's
 motive to discriminate or retaliate against Champagne is also
 insufficient, and in any event cannot overcome the fact that
 Champagne was treated no differently than his fellow drivers. 
 Given the absence of differential treatment, the district court
 properly concluded that Champagne had failed to produce
 evidence of causation sufficient to survive summary judgment.
 B. Threatened withdrawal
 Champagne finally claims that Servistar unlawfully
 threatened his enjoyment of a reasonable accommodation under
 the ADA when he filed a disability discrimination charge with
 MCAD and EEOC on July 15, 1993. The threat, he claims, came in
 the form of the June 21 memorandum. That memo stated that
 Champagne, along with all others driving a set route, would be
 required to drive rotating routes thirty days from the date of
 the memo. The memo explained: "[Y]ou must perform all the
 essential functions of your truck driving position. Rotation
 of routes within a scheduled departure group is an essential
 function of the truck driver position at SERVISTAR." The memo
 further explained that Champagne would be reassigned to light
 duty in the warehouse if "medical restrictions keep you from
 rotation within a scheduled departure group. . . . This
 accommodation will continue until your medical condition
 permits you to perform the essential functions of truck
 driving."
 On the evidence, Champagne's claim does not survive. 
 He relies on part of the ADA's anti-retaliation statute, 42
 U.S.C. 12203(b):
 It shall be unlawful to coerce,
 intimidate, threaten, or interfere with
 any individual in the exercise or
 enjoyment of, or on account of his or her
 having exercised or enjoyed, or on account
 of his or her having aided or encouraged
 any other individual in the exercise or
 enjoyment of, any right granted or
 protected by this chapter.
 
 It is doubtful Champagne has shown that he had "exercised a
 right granted or protected by the ADA." Before he filed his
 EEOC complaint, Champagne had not asserted he was disabled
 within the meaning of the ADA. He certainly never provided
 Servistar with any medical evidence from which a conclusion of
 disability, as defined in the ADA, was warranted. That
 Servistar voluntarily decided to permit Champagne to avoid
 route-rotation for a period of time does not establish that
 Champagne was disabled or that avoidance of route-rotation was
 a required reasonable accommodation.
 In this context, like the district court, we do not
 think the memorandum may be reasonably viewed as a threat or
 interference under 12203(b). Under the ADA, Servistar has
 substantial leeway in defining the essential functions of its
 truck driving positions, and it may require its drivers to be
 able to perform those functions. See 42 U.S.C. 12111(8). 
 It is true that other Servistar managers had not enforced the
 route-rotation policy strictly or cross-checked phone records
 against DOT logs in the past. But that does not permit the
 conclusion that the decision by new managers to enforce company
 policy, and to audit for non-compliance, is a threat or
 interference with ADA rights. We stress that the decision of
 new managers to enforce the policy was applied uniformly. The
 district court properly granted summary judgment in favor of
 Servistar on this claim. 
 The decision of the district court is affirmed. 
 Costs are awarded to the defendant.