**Pamela L. O'CONNELL, Plaintiff,**

v.

**ISOCOR CORPORATION, Defendant.**

**No. Civ.A. CA–99–18–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

July 13, 1999.

Michael E. Barnsback, Robl, Brown & Barnsback, PC, Fairfax, VA, for plaintiff.

John P. Corrado, Morrison & Foerster, Washington, DC, for defendant.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court is defendant's Motion for Summary Judgment or, in the alternative, Summary Adjudication of Issues. For the reasons stated in open court and below, the Motion is GRANTED.

### Background

The following facts are not in dispute. Plaintiff, Pamela L. O'Connell, is a former employee of defendant, Isocor Corporation (Isocor), a California corporation. In December 1995, plaintiff was hired by defendant to serve as a Federal Sales Manager located in defendant's Vienna, Virginia office. In July 1996, her title was changed to Manager of Business Development. In March 1997, she was assigned a sales territory for all Original Equipment Manufactures (OEM), east of the Rockies, as well as other locations throughout the country. Plaintiff's counterpart responsible for OEM sales west of the Rockies was Aric Bendorf. Bendorf was employed in the firm's Santa Monica, California office.

The parties do not dispute that in late summer and early fall of 1997, Isocor was experiencing financial problems which were addressed by an extensive reduction-in-force (RIF). Thirty-six employees, including Bendorf, were fired in October 1997. The parties also do not dispute that in October 1997, plaintiff was targeted for the RIF. She was not, however,

terminated at that time. On January 29, 1998, Bendorf, who is HIV-positive, filed suit in California state court against Isocor, alleging he had been discriminated against because of his disability. Bendorf's complaint was served on defendant on February 2, 1998.

In his complaint, Bendorf made four allegations that referred to O'Connell. The allegations were:

"Wolfe [Bendorf and O'Connell's boss] gave half of [Bendorf's] job to a female manager, who was not even at the Director level." Bendorf Complaint at ¶ 20.

"The female manager to whom half of [Bendorf's] job as Director, OEM Sales, had been given was not 'laid off' or terminated." *Id.* at ¶ 34.

"The female manager to whom half of [Bendorf's] territory had been assigned by Wolfe routinely worked out of her home, yet suffered no adverse employment consequences." *Id.* at ¶ 54.

"Almost immediately after plaintiff had assumed the position, Wolfe gave half of his territory to a female manager and plaintiff received no support in the position." *Id.* at 76.

Although the complaint never mentioned O'Connell by name, it is undisputed that the "female manager" mentioned in the Bendorf litigation was O'Connell.

Unrelated to Bendorf's lawsuit, O'Connell was involved in a serious car accident while traveling for her company on January 21, 1998. She suffered injuries to her knee and back, as well as "mental trauma associated with the near death experience." Complaint at ¶ 27. Plaintiff notified her supervisor about the accident, who then notified the worker's compensation insurance carrier. On February 2, 1998, O'Connell participated in a two-hour taped interview with the insurance carrier's claims representative, Debbie Gill.

On February 3, 1998, the day after Isocor was served with the Bendorf Complaint and the day after the worker's compensation interview, Isocor terminated O'Connell. She was advised that she was fired for reasons of "cost containment." Evidence in the record indicates that Isocor had been planning to terminate O'Connell's position for several months as part of the company-wide RIF. The parties strenuously dispute whether the initial decision to terminate plaintiff had been reversed.

Plaintiff claims that defendant had decided not to fire her and that her superiors at Isocor were treating her has if her employment could continue into 1998. For example, she points out that they sent her on the trip that resulted in her accident and that they purchased plane tickets for her to travel to California later in the year. She also claims that they had discussed her future compensation with her. Defendant argues that it had decided as of October 1997 to terminate her position but postponed putting that decision into effect because of the intercession of plaintiff's supervisor, Bill Wolfe.

On January 11, 1999, plaintiff filed the instant two-count civil action. Count I alleges a violation of the Americans with Disabilities Act (ADA), 42 U.S.C.A. § 12112(b)(4) (1995). Plaintiff alleges she was fired because "of her known business or other association with Mr. Bendorf, a qualified individual with a known or perceived disability." Complaint at ¶ 15. Plaintiff claims that she was fired "to establish a defense to the action filed by Mr. Bendorf." *Id.* at ¶ 17. Count I prays for $950,000 in actual damages, and $200,000 in punitive damages. Count II alleges wrongful termination under Virginia Code § 65.2–308, the provision that prohibits adverse employment actions against employees who file worker's compensation claims. O'Connell claims that "Isocor terminated [her] employment solely because she intended to and did file a claim for worker's compensation arising from her work related accident." Complaint at ¶ 34. Count II prays for $750,000 in actual damages and $350,000 in punitive damages.

## Discussion

### I. Standard of Review

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The "mere existence of some alleged factual dispute between the parties will ·not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II. The ADA Claim

As plaintiff explained in her pleadings and during oral argument, she is advancing two alternative theories of an ADA violation. First, she alleges an "association" claim based on her purported association with Bendorf. Second, she alleges a third-party retaliation claim based on her argument that she was retaliated against because Bendorf filed an ADA claim.

#### A) The association claim

■ O'Connell's association claim presents this Court with a case of first impression. The issue presented is whether being referred to by a co-worker in an ADA lawsuit creates an "association" between the instant plaintiff (O'Connell) and the co-worker who filed the suit (Bendorf), where the nature of the reference is a suggestion that the employer's failure to terminate the non-disabled co-worker (O'Connell) evidences unlawful discrimination against the suing co-worker (Bendorf). In other words, does an employer's perception that the continued employment of a non-disabled employee, who is referred to as a comparator in an ADA lawsuit against the employer, constitute an "association" as envisioned by the ADA? We hold that,

under the facts of this case, no association has arisen between Bendorf and O'Connell for purposes of the ADA.

The ADA prohibits adverse employment actions against non-disabled workers because of the "known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C.A. § 12112(b)(4). Associational standing exists in the ADA context to prevent employers from taking adverse employment actions against employees or prospective employees "known to have a family, business, social or other relationship or association" with a disabled individual. 29 C.F.R. § 1630.8 (1998). The regulations provide two examples of covered persons: (1) an applicant for employment who discloses that his or her spouse has a disability and is then denied employment because of a belief that he or she would miss work to care for the disabled spouse; and (2) an employee who does volunteer work with people who have AIDS and is discharged because the employer fears that the employee may contract the disease. *See id.* (Pt. 130, App.). In oral argument, plaintiff acknowledged that she had no "business, social, or other relationship or association" with Bendorf other than that they had the same employer and may have spoken on a couple of isolated occasions. There is no evidence in this record that Bendorf and plaintiff interacted or worked together or that they even knew each other well.

The only case law upon which plaintiff relies is *Crowley v. Prince George's County, Maryland,* 890 F.2d 683 (4th Cir.1989). In *Crowley,* a white employee was demoted so that the employer would have a legal defense to a black employee's claim of discrimination. In that case, the Fourth Circuit held that Crowley had stated a cause of action for discrimination under Title VII because he was demoted on account of his race; had he been black, he would not have been demoted. *See id.* at 687. However, the instant case differs from *Crowley* in at least one critical way.

O'Connell was not discriminated against because of having a disability; she is not disabled. Unlike Title VII, which protects whites and blacks equally, the ADA does not protect non-disabled people, absent some suggestion of a known association with a disabled person. In *Crowley,* the discrimination did not hinge on an *association* with a black person; rather, the Fourth Circuit relied on *direct* evidence of discrimination on account of Crowley's own race. In the instant case, there is no allegation of *direct* discrimination. O'Connell's allegation of discrimination stems from her purported association with Bendorf. Thus, *Crowley* sheds no light on the issue at hand: whether, by virtue of having been referenced in Bendorf's lawsuit, O'Connell can claim to have an association with him.

We find no support for extending the ADA's association provision to cover the instant fact situation. As the regulations make clear, the ADA's purpose is to prevent discrimination against disabled persons and those who may have a close familial, social, or possibly even physical, relationship with a disabled person. The paradigmatic case is that of the parent of a disabled child, whose employer may fear that the child's disability may compromise the employee's ability to perform his or her job. *See, e.g., Ennis v. National Assoc. of Business & Educ. Radio, Inc.,* 53 F.3d 55 (4th Cir.1995); *Tyndall v. National Educ. Ctrs., Inc.,* 31 F.3d 209 (4th Cir. 1994). In an extensive opinion excavating the legislative history of the association provision, the Tenth Circuit concluded that Congress was chiefly concerned that parents or spouses of disabled people, or people who worked with disabled people, would face adverse employment decisions. *See Den Hartog v. Wasatch Academy,* 129 F.3d 1076 (10th Cir.1997) (summarizing legislative history of 42 U.S.C. § 12112(b)(4)). Congress' concern appears to have stemmed from a belief that it is in society's best interest to encourage others to care for and assist disabled people. If employers could fire non-disabled employees for their associations with disabled people, then disabled people would become physically and socially alienated and would possibly suffer derivative discrimination at the hands of people who feared that their jobs were in jeopardy. To break this cycle of discrimination, Congress enacted the association provision.

Under the facts of the instant case, O'Connell and Bendorf lack the sort of relationship contemplated by Congress. Their "relationship" does not remotely approach a close familial, social, business or physical relationship. There is no evidence that O'Connell cared for or helped Bendorf with respect to his medical condition. O'Connell makes no claim that her employer considered her to be allied with Bendorf or in any other way connected to him. There is absolutely no suggestion that terminating O'Connell would have had a chilling effect on the care or companionship that Bendorf would have otherwise received. Moreover, as plaintiff all but admits, the associational relationship claimed with Bendorf was not even voluntary; she was thrust into this asserted connection with Bendorf by virtue of how he drafted his lawsuit and his allegation that Isocor allegedly decided to use her as a shield against that lawsuit. In short, none of the reasons for protecting associations with disabled persons apply to O'Connell. We therefore conclude that, as a matter of law, O'Connell cannot make out a case of association based discrimination.

### B) The retaliation claim

▮▮▮ Plaintiff argues, in the alternative, that she was fired "in retaliation" for Bendorf's lawsuit in violation of Title VII. Under Title VII, employers are prohibited from taking adverse employment actions against employees who engage in protected activities.[1] The anti-retaliation statute

---

1. Title VII prohibits employers from discriminating against any employee "because he

in Title VII also applies in ADA cases. *See Soileau v. Guilford, Inc.,* 105 F.3d 12, 16 (1st Cir.1997).[2] "[P]rotected activities fall into two distinct categories: participation or opposition ... An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding ... nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Wash. Airports Authority,* 149 F.3d 253, 259 (4th Cir.1998). Plaintiff acknowledges that she did not personally engage in protected activity; however, she argues that she was the victim of "third-party" retaliation because she was fired as a result of Bendorf's protected activity. As plaintiff points out, this Court has recognized that third parties have standing to assert a claim for retaliation. *See Nicol v. Imagematrix, Inc.,* 773 F.Supp. 802, 806, n. 6 (E.D.Va.1991). However, the *Nicol* case, as well as those relied upon by *Nicol,* are distinguishable from the instant case because these cases all involved the spouse of the person who had brought the discrimination lawsuit. In each case, one spouse was fired because of the protected activity of the other spouse. *Nicol* properly recognized that the threat of spouses and other very close relatives or friends facing reprisals would potentially chill employees from filing legitimate anti-discrimination lawsuits. In the instant case, there was no such close relationship between Bendorf and O'Connell, such that Bendorf might be scared out of continuing his lawsuit. In fact, the thrust of O'Connell's argument is *not* that Isocor wanted to *punish* her for what Bendorf did, but rather, that they terminated her simply to gain a legal advantage. In short, the third-party retaliation doctrine does not cover two people whose only connection is that

they happened to work for the same company. If the doctrine stretched that far, any employee who is terminated around the time that another employee files a discrimination suit would have standing to sue the employer. As the anti-retaliation jurisprudence has developed, we find no basis to extend this protection to those in plaintiff's position.

## II. Wrongful termination

Virginia Code § 65.2–308 provides that it is unlawful for an employer to "discharge an employee solely because the employee intends to file or has filed a claim under this title." In the instant case, plaintiff alleges that she was fired solely because she was preparing to file a worker's compensation claim for the accident she suffered on January 21, 1998.

According to the evidence in this record, Isocor Chief Financial Officer, Janine Bushman, was instructed by Chief Operating Officer, Paul Gigg, to begin the process of terminating plaintiff's employment on or about January 10, 1998, nearly two weeks before the accident. In her declaration Bushman states, "[s]hortly after January 8, 1998, Paul Gigg met with me and instructed me to begin preparing to terminate Pamela O'Connell's employment. Pamela O'Connell was scheduled to be terminated in or around the week of January 18, 1998." Bushman Decl. at ¶ 8. This fact was corroborated by Gigg in his June 8, 1998, deposition. *See* Gigg. Depo. pp. 26:16 – 27:14; 34:7 – 25. Plaintiff has tendered no direct evidence to refute defendant's claim that the termination decision pre-dated her accident and worker's compensation activities. Her only evidence is the circumstantial evidence that she was terminated one day after her

has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e–3 (1994).

**2.** *See also Hollestelle v. Metropolitan Washington Airports Authority,* 1998 WL 228199 (4th Cir.1998) (unpublished); *Steinacker v. National Aquarium,* 1997 WL 311519 (4th Cir.1997) (unpublished).

lengthy interview with the insurance representative. However, under Virginia law, mere evidence of coincidental timing is not sufficient to establish a prima facie case of a 65.2–308 violation. In *Jordan v. Clay's Rest Home,* 253 Va. 185, 483 S.E.2d 203 (1997), the plaintiff presented evidence that she was injured at work, that she had been performing her duties satisfactorily, that her supervisor knew she was "reporting" the injury as work-related, and that she was discharged three days later. *See id.* at 193, 483 S.E.2d 203. The Virginia Supreme Court held that where the only evidence in the plaintiff's favor is that the termination was "close in time" to the date she notified her employer of her intention to file for worker's compensation, such evidence is insufficient, as a matter of law, to go to the jury.

> Every employee injured in an accident arising out of and in the course of her employment presumably will make a claim for compensation benefits. So the timing of these events and the employer's knowledge that the employee was "reporting" the injury, without more, does not raise an inference that the plaintiff was fired solely because she intended to file a workers' compensation claim. Otherwise, a question of fact on this issue would arise in every case merely upon proof that an employee had been fired after a work-related injury. We refuse to establish such a precedent.

*Id.* Plaintiff did not attempt to distinguish *Jordan* from the instant case and she has offered no evidence other than the timing of her termination to support her claim. "[S]ummary judgment is appropriate if the evidence is 'merely colorable' or 'not significantly probative.'" *Rosado v. Virginia Commonwealth University,* 927 F.Supp. 917, 928–29 (E.D.Va.1996), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, a plaintiff cannot survive a summary judgment motion merely by asserting that material facts are in dispute. *See id.* Rather, she must be able to point to some "significantly probative" evidence to support her claim. The best evidence plaintiff has are a few actions which appear inconsistent with Bushman and Gigg's statements that the decision to fire plaintiff had been made before her accident. For example, Bill Wolfe stated that on January 12, 1998, he had a meeting with Bushman to discuss O'Connell's compensation for 1998. *See* Wolfe Decl. at ¶ 17. In addition, plaintiff points out that Gigg and Bushman consulted with counsel before terminating her, whereas they did not consult with counsel before terminating other employees. Plaintiff has no evidence of statements about her accident or previous problems that Isocor had with worker's compensation claims. Given the overwhelming evidence that plaintiff had been targeted for termination for several months, her weak evidence suggests, at best, that the worker's compensation issue was the last straw. Even if the worker's compensation claim were a motivating factor in the decision to fire plaintiff, a mixed motive termination cannot survive because the statute requires that the worker's compensation claim be the *sole* reason for the termination. Where the worker's compensation claim is simply a factor, plaintiff does not make out a cause of action. Therefore, we hold that plaintiff's worker's compensation allegation fails as a matter of law.

### Conclusion

For the reasons stated above, judgment on Counts I and II will be entered in defendant's favor by an appropriate Order.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

### ORDER

For the reasons stated in open court and in the accompanying Memorandum Opinion, defendant's Motion for Summary Judgment or, in the alternative, Summary Adjudication of Issues is GRANTED, and defendant's Objection to and Appeal from

Magistrate's Ruling is DENIED, and it is hereby

ORDERED that judgment be and is entered in defendant's favor on Counts I and II of plaintiff's complaint.

The Clerk is directed to enter judgment in favor of Isocor Corporation pursuant to Fed.R.Civ.P. 58 and to forward copies of this Order to counsel of record.