Mathieu v. Moore Business Forms        CV-97-092-JD  06/12/98
                UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE

David W. Mathieu

        v.                              Civil No. 97-92-JD

Moore Business Forms, Inc.


                            O R D E R


        The plaintiff, David M. Mathieu, brought this action against

the defendant, Moore Business Forms, Inc.,[1] alleging that the

defendant discriminated against him because of a disability in

violation of the Americans with Disabilities Act of 1990 ("ADA"),

42 U.S.C. §§ 12101-12213, and because he took medical leave

pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), 5

U.S.C. §§ 6381-6387, 29 U.S.C. §§ 2601-2654.  The plaintiff's

claim for wrongful termination in count I has been previously

dismissed.  Before the court is the defendant's motion for

summary judgment on the plaintiff's remaining claims in counts II

and III (document no. 15).

_____

        [1]Since the commencement of this action, the defendant's name
has changed to Moore U.S.A. Inc., but this change is of no
significance to the instant motion.

## Background[2]

The plaintiff was hired by the defendant on January 26, 1970. He started as a press helper and then transferred to the position of collator operator. In October or November of 1994, the plaintiff transferred to the position of off-line operator because the need for collator operators was decreasing and he was concerned that if he did not transfer his day-shift position would be eliminated. The off-line operator position was more challenging than his prior position and he had difficulty meeting the defendant's performance expectations. The plaintiff's employment was terminated on May 15, 1996, effective the following day. The defendant asserts that the plaintiff was discharged pursuant to company policy because of errors he made on the off-line machine, but the plaintiff asserts that the use of the error policy to discharge him was a pretext for illicit discrimination. Accordingly, the court sets forth seriatim the

_____

[2]The court summarizes the facts applicable to the instant motion, taking disputed issues of material fact in the light most favorable to the plaintiff and granting reasonable inferences in his favor. See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). Although the plaintiff has attempted to dispute many issues in the case, he often relies on conclusory allegations, conflicting information, and inferences that are unreasonable based on the evidence. See infra notes 5 & 6 for examples. The court disregards such attempts and grants the plaintiff only the benefit of the reasonable inferences to which he is entitled. See infra note 8.

2

relevant background information pertaining to the following:  (A) the plaintiff's contention that he is disabled; (B) the defendant's assertion that the plaintiff was discharged because of errors he committed; and (C) the events immediately preceding the plaintiff's discharge.

A.    Plaintiff's Alleged Disability

The plaintiff has been diagnosed with a major depressive disorder.[3]  He has received treatment for depression since 1993 and taken medication since 1994.  He was hospitalized for depression from January 4, 1995, to January 20, 1995.  During that time he was out of work on short-term disability leave.  The primary cause of the hospitalization, as conveyed to his treating physician, was the termination of his relationship with his fiancee because of her infidelity, but the plaintiff asserts that his condition was also exacerbated by work-related stress.

The parties dispute the extent of the defendant's knowledge about the plaintiff's condition in general and the circumstances surrounding his hospitalization in particular.  The plaintiff asserts that his distress was so obvious at times that employees

_____

3The plaintiff's DSM-IV diagnosis is Major Depressive Disorder, Single Episode, Recurrent, Severe Without Psychotic Features. The DSM-IV's diagnostic code for this disorder is 296.23.

of the defendant "must have regarded [him] as having psychological problems." Pl.'s Mem. of Law in Supp. of Objection to Summ. J. ("Pl.'s Obj.") at 16. Despite such assertions, however, because the plaintiff "wasn't exactly proud of being treated for depression," he concealed from the defendant the reason for his January 1995 medical leave, stating that he "was stressed out" and "needed time off." Pl.'s Dep. at 78. On forms filled out by the plaintiff and presented to the defendant in connection with his disability leave, he indicated that the leave was not related to his employment. Employees of the defendant heard rumors that the plaintiff had suffered a nervous breakdown and that he was suicidal, but have denied any personal knowledge of the details of the plaintiff's condition.

The plaintiff asserts that the main work-related feature of his depression is that it made it difficult for him to deal with stress and effectively perform his job duties. This manifested itself in a variety of ways. For example, the plaintiff's shift varied in length during his tenure between eight- and twelve-hour shifts, and the plaintiff had particular difficulty working twelve-hour shifts without committing errors. In addition, the plaintiff asserts that his stress and error rate were exacerbated by the lack of training he received in the off-line operator

4

position.[4]  The plaintiff thus does not dispute that he had difficulty fulfilling the defendant's performance expectations on the off-line machine, but rather contends that his depression and the defendant's inflexibility in accommodating his depression made him unable to perform his job effectively.  The plaintiff asserts that, despite his depression, he could have performed either the off-line operator position or another, less stressful position if the defendant had been willing to accommodate him.

The defendant did not provide the plaintiff with any accommodations.  During the plaintiff's employment, supervisors were not given training in how to handle issues relating to worker disabilities and the defendant did not post information in the workplace about the ADA as it requires.  During his employment, the plaintiff was not aware of the ADA and did not request any accommodation as such.  The plaintiff made some complaints and requests to supervisors, but the frequency of

---

[4]Part of the off-line operator position involved magnetic ink character recognition ("MICR").  MICR work was among the more challenging duties involved in operating the off-line machine and was a large source of errors.  The plaintiff received only on-the-job training on the use of the off-line machine.  Other employees received classroom training relating specifically to MICR.  The plaintiff has denied, however, that the failure to provide him with classroom training was motivated by a discriminatory animus.  See Pl.'s Dep. at 71-73.  Because the court does not reach the issue of reasonable accommodations, the plaintiff's claim about inadequate training is of marginal relevance.

these comments, their substance, and their efficacy to place the defendant on notice of the plaintiff's condition and his need for an accommodation is disputed.[5]

---

5For example, the plaintiff has presented the affidavit of Richard Lamy, his supervisor, which includes the following statement: "While I was [the plaintiff's] supervisor, he did occasionally complain about having to work 12 hour shifts." Pl.'s Exs., Ex. 5, ¶ 4. The plaintiff attempts to argue, based in part upon this statement, that the defendant had knowledge of the plaintiff's work-related stress and his inability, due to his depression, to work a 12-hour shift on the off-line machine. Lamy's subsequent deposition, however, places this statement in a starkly different context. He has averred the following:

> Q (by defense counsel): [Your affidavit] says that "While I was [the plaintiff's] supervisor, he did occasionally complain about having to work 12-hour shifts."
>
> A (by Lamy): That's correct.
>
> Q: You told me a few moments ago that he never made that complaint to you?
>
> A: No, I didn't say that. I said that he complained about his feet, and that he did complain about the 12-hour shift.
>
> Q: In connection with his feet?
>
> A: Yes.
>
> Q: So when you're talking there about, paragraph four, about working 12-hour shifts, it was because his feet hurt?
>
> A: Exactly.

Lamy Dep. at 38-39. Lamy's affidavit is thus insufficient to raise a genuine issue of material fact with respect to the defendant's knowledge about the link between the plaintiff's poor performance and his alleged disability. The court discusses the

B.    Defendant's Proffered Reason for Plaintiff's Discharge

The business forms industry, in which the defendant is engaged, is very competitive. As a result, the defendant places a premium on worker efficiency, which includes both high productivity and a low error rate. The defendant has an error policy, which was in force during the plaintiff's employment, that reflects its concern with keeping errors to a minimum and removing employees who have high error rates.

The defendant's error policy is based on the number of chargeable errors committed during the preceding twelve-month period. A chargeable error is one that costs the defendant over one hundred dollars to correct. Errors which cost less than one hundred dollars to correct are considered non-chargeable errors, but every three non-chargeable errors committed during a twelve-month period are counted as one chargeable error. The progressive disciplinary steps established by the error policy are as follows:  for three errors, a verbal warning; for five errors, a written warning; for six errors, a recommended twenty-four work hour suspension; and for seven or more errors, severe

_____

implication of other statements proffered by the plaintiff with respect to this issue infra.

disciplinary action up to and including termination.

The plaintiff was ultimately terminated pursuant to the defendant's error policy. He committed the following chargeable errors leading to his dismissal: on April 16, 1995, a $1,913.54 error; on May 19, 1995, a $1,036.31 error; on May 25, 1995, a $1,489.30 error; on July 9, 1995, a $602.63 error; on March 18, 1996, a $412.00 error; on March 28, 1996, a $541.36 error; and on April 4, 1996, a $652.28 error. The plaintiff has failed to raise a genuine factual dispute about his commission of the errors and the application of the error policy against him.[6]

---

[6] The plaintiff, in his memorandum in opposition to the motion for summary judgment, states the following: "There is considerable doubt about the accuracy of the tally of errors charged against [the plaintiff]." Pl.'s Obj. at 4. However, the plaintiff has failed to provide any competent evidence in support of this bald assertion. To the contrary, in his deposition he averred the following:

> Q [defense counsel]: And in the context of getting the machine running and doing your work [on April 4, 1996], you committed certain additional errors?
>
> A [plaintiff]: Yes, I did.
>
> Q: And when you came in on Monday, April 8, you were confronted with those errors?
>
> A: Yes, but I'm not even sure if it should have been an error. I ran so little, I don't know whether it affected the quantity of the order, whether they made the order or not.

Q: Is it your contention that they did not follow the error policy on their meeting with you on April 8?

A: It was my contention that they were out to get me.

Q: Well, I know you think they were out to get you, sir. That's not what I asked you. What I asked you was whether or not you can point to anything that confirms the fact from your point of view that they didn't follow the error policy that you recognized as being in place?

A: Well, there's more to this too.

Q: You can answer my question and then you can tell me what more there is. Did they follow the error policy?

A: Yes.

Q: And in accordance with that error policy, was the discipline that was going to occur to you termination?

A: The possibility of termination, yes.

Q: Now, you said there were some other things too. What were the other things?

A: Well, in May I was told I had two errors dropping off because of the --

Q: May of what year?

A: In May of '96, the year I was terminated, I had two errors that were going to be dropped due to the time period. Whether those were dropped before my termination date or they managed to fire me before those two were dropped, I don't know.

9

The plaintiff, however, contends that the error policy was wielded against him as a pretext for the defendant's real motive, an illicit discriminatory animus against him. Richard Lamy, the plaintiff's former supervisor, has averred that the defendant did not enforce the error policy consistently against all employees. Lamy stated that the defendant would aggressively use the error policy to eliminate employees it considered less desirable. The defendant considered employees' productivity, error rate, attendance, and attitudes in determining employee desirability. Due to increasing competition in the industry, the defendant would periodically downsize its operation, resulting in the dismissal of employees. When a downsizing resulted in the elimination of positions, however, employees were discharged strictly on a seniority basis despite the fact that the defendant did not always consider the more senior employees to be the more desirable employees.

To enable the defendant to retain employees it considered more desirable and eliminate employees it considered less

---

Pl.'s Dep. at 117-19. As this deposition testimony makes clear, the plaintiff committed the errors with which he was charged, has no evidence that the error tally was incorrect, and bases this claim only on his suspicion that the defendant was "out to get" him.

10

desirable, managers would prepare a "hit list" of the least desirable employees.  Then, prior to a downsizing, managers would strictly enforce company policy, including the error policy, to discharge employees on the hit list.  On the other hand, some supervisors would find ways to shield favored employees from chargeable errors, such as charging errors to former employees who had already left by the time the errors were committed and charging errors to the plant.  It is undisputed, however, that every employee who was charged with seven errors in a twelve-month period was discharged.

At some point prior to April 4, 1996, Lamy designated the plaintiff as a less desirable employee and placed him on the hit list.  Lamy has averred that he did not place the plaintiff on the hit list because of his disability or use of leave and the plaintiff has not contested this fact.[7]  Instead, the plaintiff

---

7The plaintiff would be hard-pressed to discredit Lamy's assertions in this respect even if he were inclined to do so. Although Lamy's testimony on this issue would be entitled to little weight if he were an employee of the defendant, Lamy is a former employee who left in part because of his dissatisfaction with the defendant.  Indeed, Lamy is the plaintiff's witness and the plaintiff relies heavily on his testimony to support other aspects of his case.  Under such circumstances, it would be less reasonable for a fact finder to credit those elements of Lamy's testimony that support the plaintiff's claim and to disregard those elements of his testimony that contradict it than for the fact finder to disregard wholly the testimony if he were an interested witness.

11

focuses on the events leading up to his discharge and the actions of the human resources manager, Paul Bayer.

C.    The Plaintiff's Discharge

On April 4, 1996, just prior to the plaintiff's dismissal, he had an anxiety attack while working on the off-line machine. The plaintiff, under severe pressure to get a job ready to run on the off-line machine, felt that the stress of the position was too much for him to continue to deal with. He noticed the human resources manager, Paul Bayer, walking by and flagged him down. He then begged Bayer for help because the stress of operating the off-line machine was overwhelming him and he could not handle it. He requested that he be assigned to any other job. The plaintiff does not remember Bayer's specific response, but believes that he was noncommittal.

On April 4, the plaintiff made one or more additional chargeable errors, placing him at risk of termination under the defendant's error policy. Due to the plaintiff's schedule, his next shift was April 8, 1996. On that day, within the first hour of his shift, Lamy and Bayer called the plaintiff away from his position to meet with him regarding his performance on the off-line machine. They informed him that he had committed errors during his shift on April 4 and that they needed to do further

investigation into the errors and to determine what action the defendant would take with respect to the plaintiff's employment. They suspended the plaintiff pursuant to that investigation. During the meeting, the plaintiff informed Lamy and Bayer that his doctor had suggested that he be transferred from the off-line machine.

The plaintiff's suspension and the threat of possible termination caused him a great deal of anxiety and worsened his depression. He went to see his psychologist, who recommended that he take time off from work. He requested and was granted a medical leave of absence.

On May 15, 1996, while the plaintiff was on medical leave and at the defendant's request, the plaintiff attended a meeting at the plant. At that meeting, the plaintiff was informed that the defendant had decided to terminate his employment pursuant to its error policy effective the following day. The plaintiff contends that the errors committed on April 4 were just a pretext for discharging him because he broke down in front of Bayer. He has asserted the following: "I believe that the errors I was faulted for that took place on [April 4] were just an excuse to discipline me, as part of a process to get rid of me, because I had told Mr. Bayer that I could not continue working in those circumstances and that I was a nervous wreck." Exs. to Pl.'s

13

Obj. to Mot. for Summ. J. ("Pl.'s Exs."), Ex. 1, ¶ 25.

The plaintiff subsequently brought this action asserting that his discharge, <u>inter alia</u>, violated the ADA and the FMLA. The defendant has moved for summary judgment on the plaintiff's remaining claims. Since his discharge, the plaintiff has held two jobs driving a forklift. He currently works four ten-hour days per week without difficulty. He is still being treated for depression.

<u>Discussion</u>

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." <u>Snow v. Harnischfeger Corp.</u>, 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting <u>Wynne v. Tufts Univ. Sch. of Med.</u>, 976 F.2d 791, 794 (1st Cir. 1992)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[8] Fed. R. Civ. P. 56(c). The party seeking summary

---

[8]The plaintiff, in opposition to the defendant's motion for summary judgment, has introduced an affidavit to support his case

14

judgment bears the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the plaintiff, "'indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). However, once the defendant has submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

The plaintiff's ADA claim is comprised of two separate theories: (1) the defendant failed to make reasonable accommodations to the known limitations of the plaintiff, see 42 U.S.C.A. § 12112(b)(5)(A) (West 1995); and (2) the defendant

---

that contains certain statements that contradict his prior deposition testimony. The plaintiff's affidavit, subscribed after his deposition, contains no explanation of why his testimony changed. Therefore, to the extent the plaintiff's subsequent affidavit contradicts his unambiguous prior deposition testimony, the plaintiff's affidavit "should be disregarded in considering the propriety of summary judgment." Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 5 (1st Cir. 1994).

15

terminated the plaintiff's employment because of his disability, see id. § 12112(a). The plaintiff also contends that the defendant violated the FMLA by discharging the plaintiff because of his use of FMLA-guaranteed leave. The defendant has moved for summary judgment on the plaintiff's ADA and FMLA claims, asserting inter alia that (1) the plaintiff is not disabled within the meaning of the ADA, and (2) the plaintiff has adduced insufficient evidence of retaliation to warrant a trial on the FMLA claim.

I.   ADA Claim

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual." 42 U.S.C.A. § 12112(a) (West 1995). Under the ADA, a qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). The statute defines a disability as "(A) a physical or mental impairment that substantially limits one or more . . . major life activities . . .; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Id. § 12102(2). The plaintiff maintains that he meets each element of this definition and the

16

court accordingly considers each element <u>seriatim</u>.

    A.    <u>Substantial Limitation in a Major Life Activity</u>

An individual is disabled within the meaning of the ADA if he has an impairment that substantially limits one or more major life activities. See <u>id.</u> § 12102(2)(A). Pursuant to the ADA's implementing regulations, "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1997). An impairment "substantially limits" an individual, with respect to the major life activity of working, when he is

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

<u>Id.</u> § 1630.2(j)(3)(i). With respect to major life activities other than working, the term "substantially limits" means that an individual's impairment renders him:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to

17

> the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Id. § 1630.2(j)(1).

In determining whether an individual is substantially limited in a major life activity, the court should consider the following factors:

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

Id. § 1630.2(j)(2). When properly documented, the impairment of depression may constitute a substantial limitation on one or more major life activities sufficient to meet the ADA's definition of a disability. See, e.g., Criado v. IBM Corp., Nos. 97-1341 & 97-1342, 1998 WL 282836, at *4-5 (1st Cir. June 5, 1998) (evidence of depression as ADA disability sufficient to support jury verdict); Ralph v. Lucent Techs., Inc., 135 F.3d 166, 168-70 (1st Cir. 1997) (assuming, when evaluating likelihood of success of preliminary injunction, that plaintiff's depression constituted ADA disability); EEOC v. Amego, Inc., 110 F.3d 135, 141 (1st Cir. 1997) (assuming for summary judgment purposes that plaintiff's depression constituted ADA disability); Soileau v. Guilford of

18

<u>Maine, Inc.</u>, 105 F.3d 12, 15 (1st Cir. 1997) (plaintiff introduced insufficient evidence that depression substantially limited major life activity to qualify as ADA disability). Medical evidence is not always necessary to establish the existence of a disability and a "plaintiff himself . . . might offer a description of treatments and symptoms over a substantial period that would put the jury in a position where it could determine that he did suffer from a disability within the meaning of the ADA." <u>Katz v. City Metal Co.</u>, 87 F.3d 26, 32 (1st Cir. 1996). However, for medical conditions which are not obviously disabling, medical testimony may be required to allow a jury to determine that an impairment represents a continuing serious condition that substantially limits one or more major life activities. <u>See</u> <u>id.</u> at 32-33.

The nature of the plaintiff's impairment, depression, does not make it obvious to a lay jury that his condition constitutes a long-term, substantial limitation on a major life activity. <u>See</u> <u>id.</u> at 32 (contrasting unobvious nature of heart condition resulting in one severe heart attack with obvious nature of missing arm). The defendant contends that the plaintiff is not substantially limited in the major life activity of working because he has asserted only that he is incapable of performing the off-line operator position for a twelve-hour shift and he

19

currently operates a forklift for a ten-hour shift without accommodation.  The defendant further urges that the plaintiff has not identified any other major life activity in which he suffers substantial limitation.  This showing meets the defendant's initial burden of making a properly supported motion for summary judgment, shifting the burden to the plaintiff to demonstrate that a genuine issue of material fact remains for trial.

The plaintiff concedes that the plaintiff is not substantially limited in the major life activity of working but asserts that he suffers substantial limitation in other major life activities.  In support of his claim, the plaintiff both offers medical testimony and his own testimony to that effect.

The only medical evidence proffered by the plaintiff in support of his claim for disability is an affidavit provided by a psychologist, Richard DiNapoli, Ed. D., who treated the plaintiff between December 30, 1994, and July 31, 1996.  DiNapoli has attested, in pertinent part, the following:

> Certainly, while [the plaintiff] was hospitalized, many of his major life activities were substantially limited, including his mental and emotional processors such as thinking, concentrating, and interacting with others.  Generally speaking at that time he needed hospitalization because life seemed overwhelming to him and he could not function on his own.  In addition, [the plaintiff] reported significant episodes of insomnia.

20

. . . .

> [The plaintiff] often complained about the conditions at work exacerbating his underlying depression disorder.
>
> [The plaintiff] complained that he was assigned to a new machine by his employer, [the defendant], and that he had been given little training to operate the machine. He was required to perform the job at a productivity level and a qualitative level that caused him significant anxiety especially when he worked 12 hour shifts.
>
> The stress of his job requirements, especially when faced with 12 hour shifts, exacerbated his underlying depressive disorder. It brought on occasional panic and/or anxiety attacks.
>
> [The plaintiff] reported to me fears he had over losing his job. This fear in combination with other stressors in his life and work caused him increased anxiety, which in turn exacerbated his ongoing depression disorder.
>
> I believe that, if [the plaintiff] had been able to work in a less stressful environment by some combination of fewer hours per shift or less productivity demands or more training, or a different position, he could have functioned at work more effectively especially with the assistance of medication.

Pl.'s Exs., Ex. 6, ¶¶ 10-16. The only mention of any substantial limitation on a major life activity in this evidence is DiNapoli's conclusion that the plaintiff "certainly" suffered such limitations in "many of his major life activities" during the time he was hospitalized from January 4, 1995, to January 20, 1995. Notably absent from DiNapoli's assessment is any

21

indication that the plaintiff suffered any ongoing substantial limitation in any major life activity subsequent to the hospitalization. See Katz, 87 F.3d at 32 (severe limitation connected to single hospitalization alone insufficient to establish long-term impairment). The court finds that the duration of the plaintiff's hospitalization alone is insufficient to constitute a disability and that the remainder of DiNapoli's statements provide an insufficient basis from which to conclude that the plaintiff suffered any ongoing substantial limitation in any specific major life activity.

The second form of evidence proffered by the plaintiff is his own testimony presented by affidavit. Specifically, the plaintiff has asserted the following:

> From my experience, having depression affects your whole life. It affected my relationships with other people and my ability to work. At times, I would not care for myself, could not concentrate or do any task when under stress. I had trouble sleeping especially when I worked 12-hour shifts. At times, I could not cope with anything in life and contemplated suicide. I told co-workers at [the defendant's plant] about these feelings.
>
> At least since 1994, I have been taking prescription medicine for depression, including Serzone.

Pl.'s Exs., Ex. 1, ¶¶ 6-7. These statements, however, do not "offer a description of treatments and symptoms over a substantial period that would put the jury in a position where it

22

could determine that he did suffer from a disability within the meaning of the ADA." Katz, 87 F.3d at 32. The plaintiff's general description, which clearly refers to his difficulties in the past tense, fails to include the necessary temporal information from which a fact finder could conclude that his impairment was of significant duration. In addition, it fails to provide a comparative basis from which to reasonably infer that the plaintiff was

> [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(ii).

Even considered together with DiNapoli's account of the plaintiff's depression, this evidence provides an insufficient basis to demonstrate that the plaintiff's impairment meets the statutory definition. Depression, although potentially severe enough to meet the statutory definition of disability when its effects are properly documented, does not compel a finding of disability in every case. See Soileau, 105 F.3d at 15. In this case, the court concludes that the plaintiff has adduced insufficient evidence that he is substantially limited in any major life activity to allow a reasonable fact finder to conclude

23

that he is disabled under this provision of the statutory definition.

B.     Having a Record of Such an Impairment

In addition to prohibiting discrimination against otherwise qualified individuals who have an impairment that substantially limits a major life activity, the ADA also prohibits discrimination against otherwise qualified individuals who have "a record of such an impairment."  42 U.S.C.A. § 12102(2)(B). The ADA's implementing regulations provide that an employee "has a record of such impairment" when he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k).  This provision is designed to protect people from discrimination because they have a history of a disability, such as someone who had but has recovered from cancer.  See 29 C.F.R. § 1630 App.  The plaintiff urges that his hospitalization for depression constitutes such a record of a disability. However, the plaintiff has pointed to no evidence that he had a disability in the past beyond that presented in support of his claim that he has a disability in the present.

As the court has already noted, the plaintiff's hospitalization, either standing alone or in combination with his

24

description of his subsequent symptoms, does not constitute a sufficiently limiting impairment to warrant a finding of disability under the statutory definition. A fortiori, the record of this hospitalization is insufficient to create a record of "such impairment," that is, an impairment that substantially limits a major life activity. Therefore, the conclusion that the plaintiff has not adduced sufficient evidence to support his claim that he is currently substantially limited in a major life activity leads directly to the conclusion that he has not adduced sufficient evidence to support his claim that he has a record of an impairment that substantially limits a major life activity.

C.   Being Regarded as Having Such an Impairment

Finally, an individual may be considered disabled within the meaning of the ADA if that individual "is regarded as having such an impairment" by his employer. 42 U.S.C.A. § 12102(2)(C). An employee "is regarded as having such an impairment" when he:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by [an employer] as constituting such limitation;

> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

> (3) Has none of the impairments [listed by the

regulations] but is treated by [an employer] as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).

The defendant has produced evidence supporting its assertion that, during the time of the plaintiff's employment, it was not aware that the plaintiff had any impairment beyond transitory emotional distress based on difficulties in his personal life. Although the plaintiff's depression apparently exceeded this level, the defendant has also introduced evidence showing that during his employment the plaintiff actively concealed the nature and severity of his depression from the defendant. This evidence satisfies the defendant's burden of demonstrating the lack of a genuine issue of material fact and shifts the burden to the plaintiff to produce evidence raising a material factual dispute requiring a trial. The plaintiff seeks to gain support for his claim that the defendant regarded him as having a disability from three kinds of evidence: (1) rumors that circulated at his workplace that he had emotional problems and was potentially suicidal; (2) his own assertions that employees of the defendant must have known that his depression was interfering with his work performance and therefore concluded that he was disabled; and (3) his assertion that, based on the April 4 incident when he broke down and begged Bayer for help, Bayer must have considered him to

26

be disabled.

The plaintiff's evidence of rumors about him at the plant is so vague as to preclude any reliable inference about the defendant's knowledge or belief as to his condition.  The following presents a representative example of the testimony of fellow employees upon which the plaintiff relies:

> Q (by plaintiff's counsel):  Were you generally aware that [the plaintiff] had taken a leave of absence because he had a nervous breakdown or something like that?
>
> A (by William Donald O'Brien, a coworker):  No.
>
> Q:  Do you recall his taking a leave of absence sometime around January of '95?
>
> A:  I knew he was out, but I don't know the reason why.
>
> Q:  What were the rumors about that that you were aware of?
>
> A:  That he had a nervous breakdown or whatever, but I didn't know for a factual part.
>
> Q:  You certainly hadn't spoken to his doctors; you didn't know exactly what his situation was, correct?
>
> A:  Correct.
>
> Q:  Okay.  But the general discussion was that [the plaintiff] had a nervous breakdown, correct?
>
> A:  Correct.
>
> Q:  After [the plaintiff] came back from that leave of absence in the January/February 1995 time frame, was it generally known that [the plaintiff] was

27

having emotional problems?

Q:  No.  Just said he couldn't sleep at night and everything.

Q:  And were you aware he was taking medicine?

A:  No.

Q:  Have you ever heard of any rumors about [the plaintiff's threatening to commit suicide or possibly being suicidal?

A:  Yes.

Q:  This was in the 1995/1996 time frame?

A:  Yes.

Pl.'s Exs., Ex. 11 at 13-14.  This testimony, while supporting the plaintiff's contention that rumors about him circulated at the plant, falls far short of allowing a reasonable inference that the defendant regarded or treated the plaintiff as having an impairment that substantially limited a major life activity.

The plaintiff also maintains that he complained repeatedly to employees, including supervisors, about his inability to perform his job due to stress, the length of his shifts, and his lack of training on the off-line machine.  He also requested transfers to other positions.  The plaintiff urges that, based on these statements, the defendant must have known about the extent of his impairment and concluded that he was disabled.  Even assuming arguendo that the plaintiff's complaints were as

28

frequent and as clear as he now asserts, at most they allow an inference that the defendant considered and treated the plaintiff as incapable of performing the off-line operator position.[9] As discussed <u>supra</u>, the inability to perform a single job does not constitute a substantial limitation on the major life activity of working. Therefore, these statements are insufficient to allow a reasonable inference that the defendant regarded or treated the plaintiff as having a substantial limitation in any major life activity.

Similarly, the plaintiff finally contends that, in the aftermath of the April 4 incident in which he alleges that he broke down in front of Bayer and begged him for help, Bayer must have considered him disabled. Even assuming that Bayer did draw negative conclusions about the plaintiff's condition and abilities based on the incident, a proposition for which the plaintiff has offered nothing more than his own bald assertion, the plaintiff has not adduced sufficient evidence that any such conclusions by Bayer extended beyond an assessment of the plaintiff's ability to perform the functions of the off-line operator position. Indeed, the plaintiff's own assertions admit

---

[9]It is undisputed that the plaintiff satisfactorily performed the collator operator position and other positions for over twenty years. After the plaintiff's discharge, the defendant provided him with a positive letter of recommendation.

as much, as witnessed by the following statements from his affidavit:

> Mr. Bayer had known from earlier conversations (at least three) that I wanted to transfer off the [off-line] machine because I was such a nervous wreck, and because I could not operate the machine properly. I said to him you have to help; I cannot do this anymore. I begged him to please help me that I could no longer do the job as an off-line operator.

Pl.'s Exs., Ex. 1, ¶ 21. As noted previously, the defendant's belief that the plaintiff could not perform the duties of the off-line position, even if it also believed that the basis for his inability was stress or depression, does not establish that the defendant regarded the plaintiff as having a disability because the inability to perform one job is not a substantial limitation on the major life activity of working.

Even considering the plaintiff's evidence in all three of these areas together, as the court must, it is insufficient to allow a reasonable fact finder to infer that the defendant regarded the plaintiff as having an impairment that substantially limited one or more major life activities. At best, the plaintiff's evidence allows the following reasonable inferences: the defendant regarded the plaintiff as having personal problems, possibly including depression; it regarded him as incapable of performing the off-line operator position; and it believed that there was some connection between the two. The plaintiff has

30

adduced insufficient evidence to allow a reasonable fact finder to conclude that the defendant believed that lurking behind this was an impairment that substantially limited one or more of the plaintiff's major life activities. Despite the plaintiff's valiant attempt to put the facts in this case in the most positive light, the plaintiff's purported showing that the defendant regarded him as having a disability is based on no more than "conclusory allegations, improbable inferences, and unsupported speculation." See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

D.   Conclusion

The plaintiff has failed to demonstrate a genuine issue of material fact with respect to any of the three possible definitions of disability under the ADA.[10] Accordingly, the court grants the defendant summary judgment on count II of the plaintiff's claims.

II.   FMLA Claim

---

10The court need not consider the parties' additional arguments with respect to the plaintiff's claims that he was discharged because of his disability and that the defendant failed to accommodate him because the court has found that the plaintiff was not entitled to the protections of the ADA.

31

The FMLA guarantees eligible employees "a total of 12 workweeks of leave during any 12-month period" for a number of reasons including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C.A. § 2611(a)(1)(D) (West Supp. 1998). It also prohibits retaliation against employees for requesting or taking guaranteed leave. See 29 U.S.C.A. § 2615(a) (West Supp. 1998). Recently, the First Circuit adopted the burden-shifting framework developed in other discrimination cases "for analyzing the tricky issue of motivation" involved when a plaintiff claims he was discharged for taking FMLA leave but the employer claims that he was discharged for a legitimate nondiscriminatory reason. Hodgens v. General Dynamics Corp., No. 97-1704, 1998 WL 248013, at *6 (1st Cir. May 21, 1998).

To sustain a claim within this framework, an employee must first establish a prima facie case by showing the following:

> (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action.

Id. at *7. The burden of production then shifts to the employer "'to articulate some legitimate, nondiscriminatory reason for the employee's [termination],' sufficient to raise a genuine issue of fact as to whether it discriminated against the employee." Id.

32

at *6 (alteration in original) (quoting <u>McDonnell Douglas Corp.</u> <u>v. Green</u>, 411 U.S. 792, 802 (1973)). If the employer does so, the presumption of discrimination drops from the case and the plaintiff must fulfill his "ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave." <u>Id.</u> Summary judgment in such cases is to be used cautiously, but it may still be appropriate, particularly where "the non-moving party rests merely on conclusory allegations, improbable inferences, and unsupported speculation." <u>Id.</u> at *14, 16 (granting summary judgment on FMLA retaliation claim) (internal quotations omitted).

In this case, the defendant argues that the plaintiff had already exceeded the statutorily mandated leave period prior to his dismissal and contends that the plaintiff has produced no evidence that his discharge was in retaliation for requesting medical leave. The plaintiff took more than eight weeks of medical leave from July 25, 1995, to September 24, 1995, and more than five weeks of medical leave from April 8, 1995, to May 18, 1996, the date of his discharge.[11] Thus, at the time of the

_____

11The plaintiff took the July-to-September leave to have kidney surgery. As previously noted, he took the April-to-May leave because of stress related to his suspension.

plaintiff's dismissal, he had already exceeded the leave time guaranteed by the FMLA. The plaintiff concedes that the defendant could have denied the plaintiff additional leave, but contends that his discharge still violated the FMLA because it was motivated by retaliation against him for his exercise of FMLA leave. Therefore, the burden-shifting framework described in Hodgens governs the plaintiff's claim. See id. at *6.

For the purposes of this motion, the court assumes without deciding that the plaintiff has made out a prima facie case of retaliation. The defendant, in turn, has satisfied its burden of demonstrating the lack of a genuine issue of material fact on its claim that the plaintiff's violation of the error policy constituted a legitimate reason for the plaintiff's discharge. This showing shifts the ultimate burden of persuasion to the plaintiff to adduce sufficient evidence from which a reasonable fact finder could conclude not merely that the defendant's proffered reason was a pretext, but that it was a pretext for discriminatory retaliation against the plaintiff for his exercise of rights guaranteed by the FMLA. See id.

The plaintiff contends that the temporal proximity between his begging for help on April 4, his requested leave after his suspension on April 8, and his termination on May 15 support the inference that his termination was retaliatory. Although it is

34

true that "close temporal proximity between two events <u>may</u> give rise to an inference of causal connection," <u>see</u> <u>id.</u> at *16 (emphasis added), such an inference is not warranted in this case. The plaintiff's use of FMLA medical leave during July to September of 1995 significantly predated his discharge.[12] Although his use of FMLA medical leave from April to May of 1996 immediately preceded his discharge, the circumstances of the discharge belie any reasonable inference of a causal link between the two events.

On April 8, the plaintiff was suspended pursuant to the error policy pending a determination of whether he should be discharged. The stress of the suspension and his fear of termination allegedly worsened the plaintiff's depression, causing him to seek the medical leave. To establish a causal link between the leave and the discharge under such circumstances, a fact finder would have to conclude that the defendant decided not to discharge the plaintiff legitimately for errors, in the face of uncontroverted evidence that it had previously discharged every employee who was charged with seven errors in a twelve-month period, but instead decided to discharge him with discriminatory animus in retaliation for taking FMLA-

_____

[12]The plaintiff's hospitalization in January 1995 is even further temporally removed.

35

guaranteed leave. The complete lack of evidence to this effect provides a fact finder no reasonable basis to arrive at such a conclusion.

The plaintiff also relies on his assertions that the defendant utilized the error policy against him in a discriminatory fashion. The court assumes arguendo that the plaintiff's evidence about the defendant's use of the error policy constitutes some competent evidence of pretext. See id. at *6. However, the plaintiff must produce evidence not merely that the defendant's proffered reason for the discharge was pretextual, but that it was a pretext for retaliation against the plaintiff for his use of FMLA leave. See id. The plaintiff has come forward with nothing more than "conclusory allegations, improbable inferences, and unsupported speculation" in support of this claim. See id. at *6.

The evidence of the plaintiff's own witness, Richard Lamy, who has asserted that he placed the plaintiff on the defendant's "hit list" because of poor performance, has not been controverted by anything other than the plaintiff's self-serving assertions to the contrary. The plaintiff has failed to offer any competent evidence to suggest that the plaintiff's use of FMLA leave even entered into the defendant's decision making process. The plaintiff's allegations are simply insufficient to allow a fact

36

finder reasonably to infer that the real motive behind his discharge was retaliation. Therefore, the defendant is entitled to summary judgment on the plaintiff's FMLA claim in count III.

## Conclusion

For the reasons stated above, the defendant's motion for summary judgment on the plaintiff's ADA claim in count II and the plaintiff's FMLA claim in count III (document no. 15) is granted. The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

June 12, 1988

cc:  Eugene R. Quinn, Esquire
     Edward M. Kaplan, Esquire

37